**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| TIMMOTHY GREENE (#75506) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:23 C 50222 |
| | ) | |
| WINNEBAGO COUNTY SHERIFF GARY | ) | Judge Rebecca R. Pallmeyer |
| CARUANA, OFFICER JOSEPH T. | ) | |
| CALLAHAN, OFFICER MICHAEL DELGADO, | ) | |
| OFFICER LAWRENCE AIRDO, VALERIA | ) | |
| KIDD, and CAROLINA ZARATE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On the morning of April 17, 2022, Plaintiff Timmothy Greene, a pretrial detainee at the Winnebago County Jail, fell from his bed and hurt his shoulder. Greene believed he had a dislocated shoulder; he repeatedly requested medical attention from jail officials, but they did not immediately treat him. An X-ray taken the following day, April 18, 2022, showed no dislocation. But Greene filed this lawsuit under 42 U.S.C. § 1983, alleging that officials' delayed medical treatment was objectively unreasonable in violation of the Fourth Amendment. Defendants have moved for summary judgment. As explained below, this motion is granted.

## BACKGROUND

At the time of the events giving rise to this lawsuit, Timmothy Greene was a pretrial detainee at the Winnebago County Jail in Rockford, Illinois.[1] (Sheriff Defs. SOF [97] ¶ 3.) At some point on the morning of April 17, 2022, Greene fell two feet from his bunk onto the floor of his cell, hurting his left shoulder. (*Id.* ¶ 5; *see also* PSOF [109] ¶ 1.) The injury resulted in no

---

[1] The facts laid out in this section are taken from the parties' respective LR 56.1 submissions. (*See* Defendants Caruna, Callahan, Delgado, Airdo LR 56.1(a)(2) SOF ("Sheriff Defs. SOF") [97]; Kidd & Zarate LR 56.1 SOF ("Nurse Defs. SOF") [100]; Plaintiff's Statement of Additional Facts ("Pl. SOF") [109].) For the purposes of this summary judgment motion, disputed facts are taken in the light most favorable to Greene, the non-moving party.

blood or obvious disfigurement, but caused severe pain. (Sheriff Defs. SOF ¶ 7.) Greene called for Defendant Joseph T. Callahan, a corrections officer, and asked that he "call an emergency Code 100" to trigger emergency medical treatment. (*Id.* ¶¶ 8–9.)

At the jail, requests for medical intervention are divided into two categories: emergencies and non-emergencies. (Kidd Dep. [97-2] at 17:20–18:12.) As Defendant Valarie Kidd, a nurse at the jail, explained during her deposition, emergencies include "[l]ife and limb threatening" events, such as "an allergic reaction where the throat was closing" or "somebody bleeding out"—these events received immediate care. (*Id.* at 18:3–19:5.) Non-emergencies include all other medical events; those patients are scheduled for a visit from a provider during the jail's sick call, which takes place at least once per day. (*Id.* at 18:16–19, 43:7–18.) When asked if a fall from a bed would constitute an emergency under jail policy, Kidd responded,

> I mean, there's so many factors. It depends. If – if someone falls off a bunk and has an urgent need, there's typically a code called. It's not a let's wait and do a nonemergent sick call. I mean, if the shoulder is dislocated and they can't move it, we would have to go see that right away versus, you know, he fell out of bed and his arm hurts. We would – I would not consider that emergent.

(Kidd Dep. [97-2] at 32:9–32:16.)

Consistent with Kidd's description of the jail's policy, Officer Callahan refused to call for emergency aid. He informed Greene that "Medical was not going to do anything but come in the pod and give [Greene] Tylenol," and that calling an emergency would result in the housing pod being locked down. (Sheriff Defs. SOF ¶ 11.) Instead, Callahan proposed an alternative course of action: he stated he would "go get the nurse and bring her down," and Greene agreed. (Pl. Dep. [97-1] at 86:11–86:16.) Callahan went to his desk, called the medical team, and returned to Greene's cell and informed him that "[t]hey'll be sending someone over here." (*Id.* at 87:23–88:1.)

But Greene did not immediately receive treatment. About thirty minutes after his conversation with Callahan, for unclear reasons, the housing pod was locked down. (Sheriff Defs. SOF ¶ 17.) During the lockdown, Greene requested that Callahan film his injured shoulder with

his body-worn camera, and according to Greene, Callahan did so.[2] (*Id.* ¶¶ 18–22.) Sometime later, Callahan returned to Greene's cell, and asked whether the nurse had come to his cell. (*Id.* ¶ 32.) Greene responded that he had not yet seen a nurse, and Callahan promised to follow up with the medical team. (*Id.* ¶ 33.) Thirty minutes later, Callahan returned to Greene's cell and promised a nurse "was on her way." (*Id.* ¶ 34.) But about thirty minutes after that, there was another medical emergency in the jail, and Greene was informed by Callahan that his examination would be delayed because the medical staff were tied up dealing with the emergency. (*Id.* ¶ 35.) It is not clear what this other emergency involved, how many members of the jail's medical staff were required to respond it, or how long it took to resolve.

Later that morning—sometime between 10:00 a.m. and noon, according to Greene—he pressed his cell's emergency call button, and Officer Michael Delgado responded. (*Id.* ¶¶ 36, 41.) Greene once again complained about his injury, and Delgado informed him that the housing pod officer (evidently Callahan) would return shortly from break, and could handle the situation. (*Id.* ¶ 40.) Greene described this interaction during his deposition:

> He said, "What's your emergency, Greene?" . . . I said, "Delgado?" He was like, "Yeah, What's your emergency?" I said, "Man, I fell out of the bed." He said that – "Your officer will be back in the pod shortly. Let him know what's going on."

(Pl. Dep. [97-1] at 103:15–104:17.) Delgado disconnected the call while Greene was "in the middle of explaining to him." (*Id.* at 101:24–102:2.)

At 12:53 p.m., having not heard anything from the medical team, Greene filed the first of several medical grievances. (Sheriff Defs. SOF ¶ 46.) At the jail, inmates can request medical care by filing a digital medical request via a grievance submitted on a tablet or kiosk in their jail cell. (*Id.* ¶ 45.) His first grievance read:

---

[2] Callahan denies this; while he does not recall the specific events of April 17, he states that no inmate has ever asked him to record their injuries using his body-worn camera. (Callahan Dep. [97-4] at 34:14–20; 56:8–11.) The camera footage is not part of the summary judgment record.

> I fail [sic]out of bed this after noon. And my arm, and shoulder, is in a lot of pain. [I]t feels like something's out of place. I took some pain pills that I got off the inmate store list. It is not helping me. I told my units officer. He told me to put it in to medical if it doesn't get better. This was before lunch time. And it feels worse. It is red and swollen and in pain. I can move it but when I do it pop's in and out. [N]eed to see medical. Tky.

(Defs. Ex. H, Grievance [97-8] at 1.)[3] It is not clear what time that day Greene took the "pain pills" referenced in the grievance. He filed a second materially similar grievance at 2:37 p.m. (Defs. Ex. I, Grievance [97-9] at 1.) At around 6:00 p.m., Medical Nurse Ryan Vanderbush responded to the grievance by messaging Greene that a nurse visit had been scheduled. (Nurse Defs. SOF [100] ¶¶ 27–29.) But the visit did not take place until around 2:00 a.m. the next morning; in the interim, Greene filed four additional grievances that night, at 9:19 p.m., 9:30 p.m., 10:27 p.m., 10:33 p.m. (Nurse Defs. SOF ¶¶ 29–36.) Each of these grievances complained of the jail's decision to not treat his shoulder injury as an emergency.[4] At around 2:00 a.m. on April 18 (the day after Greene's fall), Defendant Nurse Carolina Zarate arrived at Greene's cell; she gave him Tylenol, but did not examine him. (Sheriff Defs. SOF ¶ 50; Pl. Dep. [97-1] at 43:6–14 (describing the visit).) At 3:00 a.m., Greene "popped his shoulder back in." (Pl. Resp. to Sheriff Defs. SOF ¶ 60.) He claims that he attempted to pop his shoulder back in after having seen a similar technique used in the movie *Lethal Weapon*, and his shoulder "got better instantly" but "still hurt." (Pl. Dep. [97-1] at 78:22–80:5.) Later that morning (at an unspecified time), Nurse Caitlynn Porter examined Greene during the jail's sick call. (Sheriff Defs. SOF ¶ 58; Pl. Dep. [97-1] at 49:10–19.) Porter recorded the following observation in his chart:

---

[3] The court notes that Greene asserts, via this grievance, that he fell out of bed "this after noon." There is no evidence in the record that suggests that Greene fell out of his bed multiple times that day. The court assumes that the reference to the afternoon was a typo, especially considering that the grievance also asserts that he complained of the injury to a corrections officer "before lunch time." (Defs. Ex. H, Grievance [97-8] at 1.)

[4] For example, in the 9:30 p.m. grievance, he states "I just don't get it. Why I have to wait until tomorrow to be seen by medical. For what I think is an emergency? I can not self medicat [sic] my self if I am out of medication." (Nurse Defs. SOF ¶ 30.)

> Sick call slip to medical for patient falling off lower bunk multiple times and injuring left shoulder. Patient self-reports his left shoulder popped out of place and he popped it back in on 4/17/22 at 10:00 a.m. Patient self-reports to falling off of bunk in the past. Patient refused to put mat on the floor when suggested and became angry when told camera cell observation might be needed. Patient self-reports pain 10 out of 10 constant in left shoulder. Patient self-reports numbness and tingling in left hand but self-reports he had it prior to fall. Patient has signs and symptoms of pain with movement, minimal swelling, and bruising. Patient winces and complains of pain when touched to palpate. Limited range of motion noted. Can lift arm halfway up.

(Porter Dep. [97-3] at 28:9–25 (quoting Greene Medical Chart [97-12]).[5]) Porter prescribed Tylenol and ibuprofen for two weeks as needed, and ordered "provider review" "to determine whether Plaintiff needed an x-ray or not." (Sheriff Defs. SOF ¶¶ 64–65.) Nurse Practitioner Kisha Turner reviewed Nurse Porter's notes and ordered an X-ray, which was conducted later that same day. (*Id.* ¶ 66.) The radiologist report, which is dated April 18, 2022, states that the X-ray results were unremarkable, and did not reveal any dislocation or fracture. (Radiologist Rep. [97-13].)

This lawsuit resulted. Greene filed a *pro se* complaint on June 12, 2023, alleging that jail officials unreasonably delayed medical care in violation of the Eighth Amendment. On January 17, 2024, Mr. Greene requested attorney representation, noting that he had broken his hand in an unrelated incident and could not write. Observing that the statute of limitations was approaching, Magistrate Judge Jensen of this court granted his request and recruited *pro bono* counsel pursuant to Local Rules 83.11 and 83.37 to assist with service of process. (*See* Order [32].) Recruited counsel filed an Amended Complaint and, after discovery, Defendants moved for summary judgment.

---

[5] The timeline in Porter's notes is somewhat at odds with Greene's current testimony. For example, the notes suggest that Greene popped his shoulder back in at 10:00 a.m. on April 17, but Greene testified that he popped his shoulder back in at around 3:00 a.m. on April 18, 2022.

**DISCUSSION**

I.      **Legal Standard**

Summary judgment is appropriate "if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In considering a motion for summary judgment, "the district court must construe all facts and draw all reasonable inferences in favor of the non-movant."  *Srail v. Village of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings.  *Anderson*, 477 U.S. at 256–57.  Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion."  *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

II.     **Analysis**

A.      **Failure to Provide Medical Treatment**

The Fourteenth Amendment requires jail officials to "safeguard the health and safety of pretrial detainees."[6]  *Gonzalez v. McHenry Cnty.*, 40 F.4th 824, 827 (7th Cir. 2022).  Because a pretrial detainee is entitled to a presumption of innocence and cannot be punished until their conviction, their right to receive medical care emanates from their Fourteenth Amendment due

---

[6]      Greene brings his claim under the Eighth Amendment, but because he was a pretrial detainee at the time of the incident, the Fourteenth Amendment standard governs.  The court will construe his claim as being properly brought under the Fourteenth Amendment.

process rights, not from the Eighth Amendment's cruel and unusual punishment clause. *See Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017); *see also Miranda v. Cnty.* of *Lake*, 900 F.3d 335, 350–51 (7th Cir. 2018) ("Pretrial detainees stand in a different position: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence."). Accordingly, while claims of delayed medical care brought by *convicted prisoners* are subject to the Eighth Amendment's exacting "deliberate indifference" standard, the Fourteenth Amendment standard for *pretrial detainees* is looser: they need only show that "(1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the decedent's medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the decedent's medical need; and (4) the defendant acts 'purposefully, knowingly, or perhaps even recklessly' with respect to the risk of harm." *Gonzalez*, 40 F.4th at 828 (quoting *Miranda*, 900 F.3d at 353–54). This is known as the "objectively unreasonable" standard. *See, e.g.*, *Kemp v. Fulton Cnty.*, 27 F.4th 491, 495–96 (7th Cir. 2022).

Greene argues that jail officials and nurses behaved in an objectively unreasonable manner by delaying the treatment of his (allegedly) dislocated shoulder. (Opp'n [111] at 6.) The court notes, at the onset, that Greene's case faces a major roadblock in that there is no evidence he ever suffered a dislocated shoulder. There are no contemporaneous medical records that show his shoulder was disfigured, and an X-ray conducted the day after the injury confirmed that, at least when the X-ray was taken, there was no dislocation. (*E.g.*, Radiologist Rep. [97-13].) The only evidence Greene offers is his own testimony that he *believed* his shoulder to be dislocated due to severe pain. But Greene, who is not a medical professional, is not qualified to offer a diagnosis. Pain associated with his injury might have led him to believe that he suffered a dislocation, but his personal belief is speculation, and speculation is insufficient to survive summary judgment. *Flowers*, 105 F.4th at 946; *see also Podkulski v. Williams*, No. 15-CV-11870, 2022 WL 991963, at *7 (N.D. Ill. Mar. 31, 2022) (Eighth Amendment) ("Beyond [plaintiff's] own testimony that he did in fact suffer an injury, there is also no evidence in the record to support that

7

such injury constituted an objectively serious medical condition."); *Howell v. Houston*, No. 17 CV 3397, 2019 WL 174981, at *4 (N.D. Ill. Jan. 9, 2019) ("Plaintiff has not established that he sustained any injury at all, let alone that he had a serious medical need.")

Without evidence that he did in fact suffer a dislocated shoulder, Greene must present evidence that jail officials responded to his reports of pain in an objectively unreasonable manner. Pain can indeed be a serious medical condition on its own, even without any objective physical manifestation. *See, e.g.*, *Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996). But Greene's claim still fails because there is no evidence that any Defendant's response was unreasonable. Greene notified Officer Callahan soon after his injury, and Callahan immediately notified the jail's medical team. Greene was not visited by a nurse immediately—undisputed evidence suggests that there was a pod lockdown and a separate medical emergency in the jail that might partially explain the delay—but he was visited by a nurse later that night, who gave him pain medication, and he was examined and given an X-ray the next day with unremarkable results. While his fall surely caused pain, a wait of mere hours for pain medication and a day for an X-ray does not strike the court as unreasonable in this context.

Greene believes the guards should have considered his painful shoulder an emergency and called for immediate medical treatment. (*E.g.*, Opp'n [111] at 2–3.) But again, as there is no evidence that his condition was a genuine emergency, the officers' decision to not treat it as such is reasonable as a matter of law. A detainee has no constitutional right to receive emergency medical care for a non-emergent injury. As a court in this circuit observed in the context of a deliberate indifference claim, if "prison medical staff had a constitutional duty to drop everything whenever a prisoner asked for nonemergency treatment, it is likely that they would not be able to provide effective care for any prisoner." *Peterson v. Meisner*, No. 15-CV-49-JDP, 2017 WL 5054729, at *12 (W.D. Wis. Nov. 2, 2017). The same goes for pretrial detainees.

Greene cites several cases recognizing that a jail's failure to address extreme pain can constitute a constitutional violation. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011)

8

(failure to provide rheumatoid arthritis medication for over ten months), *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (failure to treat toothache for over two months), and *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (five-day delay in treating bleeding, vomiting, pain, and eye damage following attack by another inmate).  It is indeed true that officials' failure to treat a painful condition can constitute a violation of the Fourteenth Amendment (or Eighth Amendment) even without any lasting physical injury.  But each of those cases involved pain resulting from a condition left untreated for some time.  They thus provide no support for Greene, who suffered temporary pain as a result of a fall but has proffered no evidence that his pain would have resolved more quickly with a more expedited examination.

In addition, it is not clear what Greene believes the medical staff could have done during the afternoon and evening of April 17 to address his pain.  The jail's delay in dispensing Tylenol might have led to a slight increase in the duration or intensity of his pain, but a brief delay in administering Tylenol does not rise to the level of a constitutional violation, particularly light of Greene's own testimony that he already had some kind of pain medication that he took shortly after the accident.  Nor is it clear that an expedited X-ray would have made a difference, as the results on the X-ray itself were unremarkable and (apparently) led to no further treatment.  At very most, jail officials acted negligently, but *Miranda* made it abundantly clear that "negligence or gross negligence"—even if it would be the basis for medical malpractice—does not offend due process.  *Miranda*, 900 F.3d at 353.

Summary judgment is granted on the § 1983 failure to provide medical treatment claim.

### B.      Spoliation

Plaintiff also brings a spoliation of evidence claim under Illinois law, claiming that Defendants unlawfully failed to preserve Officer Callahan's body-worn camera footage of Greene's injury.  (Opp'n [108] at 6.)  With all federal claims dismissed from this case, the court relinquishes jurisdiction over the state-law spoliation claim without prejudice to renewal in state court.  *See* 28 U.S.C. § 1367(c)(3); *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010) ("Normally,

when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." (quotation marks omitted)).

## **CONCLUSION**

Defendants' motions for summary judgment [96, 99] are granted. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff.

ENTER:

Dated: February 25, 2026

_____

REBECCA R. PALLMEYER
United States District Judge